Ronald **TAYLOR**, et al.

v.

**UNITED STATES DEPARTMENT OF LABOR**, et al.

Civ. A. No. 75–1437.

United States District Court, E.D. Pennsylvania.

Dec. 7, 1982.

Thomas K. Gilhool, Michael Churchill, Frank Finch III, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for plaintiffs.

Jay S. Berke, U.S. Dept. of Labor, Philadelphia, Pa., for Employment Standards.

Heidi D. Miller, Civ. Rights Div., U.S. Dept. of Labor, Washington, D.C., for defendants.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In this class action suit, the named plaintiffs, five black construction workers and an organizational plaintiff, Resurrection, Inc., seek declaratory and injunctive relief to compel the defendants, federal agencies and officials, to achieve the minority worker utilization goals of Executive Order 11246 (hereinafter "E.O. 11246") in connection with affirmative action in Philadelphia construction trades. In particular, plaintiffs seek to have this Court order the defendants to ensure construction contractor compliance with the procedures of the "Philadelphia Plan" designed to achieve equal employment opportunity for minority construction workers in connection with federally assisted construction in this area, and to fulfill the goals of the Plan.[1] This Court has jurisdiction pursuant to 28 U.S.C.

§ 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 28 U.S.C. § 1361 (mandamus) and 5 U.S.C. §§ 701, et seq. (the Administrative Procedure Act). On July 31, 1980, plaintiff class was certified pursuant to Fed.R.Civ.P. 23(b)(1) and (b)(2) on behalf of all black construction workers and black persons qualified for and seeking construction work in the Philadelphia area who may have, due to defendants' alleged failure to enforce E.O. 11246, and the requirements of the Philadelphia Plan, lost or may lose employment opportunity in federally assisted construction work in the Philadelphia metropolitan area. Trial was held before this Court sitting as a finder of fact. For the reasons hereinafter set forth, the Court must deny the relief sought by plaintiffs and enter judgment in favor of defendants.

### I.  The Background of This Litigation

Executive Order No. 11246, 30 Fed.Reg. 12319 (Sept. 24, 1965), 3 C.F.R., 1969 Comp. 133 was issued by former President Lyndon Johnson in 1965. The Executive Order requires all contractors seeking to do business with the federal government or participating in projects that receive federal assistance to include in their construction contracts specific provisions respecting fair employment practices. Section 202(1) of the Order provides

> The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, religion, sex or national origin.

The Order requires that the contract between a builder and the government, and all contracts between the contractor and subcontractors, contain this non-discrimination clause. The Labor Department's Office of Federal Contract Compliance (OFCC) was given responsibility for super-

---

1. The Philadelphia Plan ceased to exist as an entity separate from general federal contracts anti-discrimination rules on April 7, 1978, and was incorporated into the general federal anti-discrimination provisions, see 43 Fed.Reg. 14,-888 (1977). For ease of reference, the Court will refer to federal equal employment opportunity programs in the Philadelphia area construction trades as the "Philadelphia Plan," throughout this opinion.

vising the efforts of various federal agencies to obtain compliance with this portion of the order. Specifically, Section 201 of E.O. 11246 provides that the "Secretary of Labor shall be responsible for the administration of [the government contracts and federal assistance affirmative action requirements] of this Order and shall adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof."

However, until October of 1978, each federal agency administering contracts or federal aid for construction was responsible, in the first instance, for securing compliance. All low bidders on projects were reviewed for equal employment prior to the official award of the contract. In projects involving larger (more than 50 employees) contractors or larger (more than $50,000) expenditures, affirmative action plans were required of the contractor. The agency for whom the project was being built was responsible for making periodic checks to ascertain whether there was compliance with the affirmative action plan. These efforts were to be coordinated by OFCC. Where contractors failed to comply with the Order, the agency was authorized to suspend or cancel the contract, or to debar the contractor from future federal contracts. *See generally* Leiken, *Preferential Treatment in the Skilled Building Trades: An Analysis of the Philadelphia Plan,* 56 Cornell L.Rev. 84, 87–91 (1970); *see also* Comment, *The Philadelphia Plan: A Study in the Dynamics of Executive Power,* 39 U. Chicago L.Rev. 723, 725–26 (1972) (discussing history of executive orders dealing with discrimination which preceded E.O. 11246).

The Order empowers the Secretary of Labor to issue rules and regulations necessary and appropriate to achieve its purpose. On June 27, 1969 Assistant Secretary of Labor Arthur Fletcher issued an order implementing the Executive Order in the five-county Philadelphia area. The June 27, 1969 order, known popularly as the "Philadelphia Plan," required bidders, prior to the award of contracts, to submit "acceptable affirmative action" programs "which shall include specific goals of minority manpower utilization" for all contracts concerning federal or federally assisted projects whose total cost exceeded $500,000.

The June 27, 1969 Order also contained a finding that enforcement of the affirmative action requirement of E.O. 11246 had posed special problems in the construction trades. In these trades, contractors and subcontractors must hire a new group of employees for each job. In conducting such hiring, the contractors rely on craft unions as their prime source of labor. In many instances, craft unions comprise the sole source of labor for a given project. Historically, craft unions have provided such labor through the operation of hiring halls, which receive a contractor's request for labor and workers and fill this request with appropriately skilled workers who have reported to the hiring hall and made themselves available for work on that day. The June 27, 1969 Order noted that "[b]ecause of the exclusionary practices of labor organizations, there traditionally has been only a small number of Negroes employed in [seven major craft] trades." The trades which the June 27, 1969 Order found to have historically excluded blacks were: ironworkers, plumbers and pipefitters, steamfitters, sheetmetal workers, electrical workers, elevator construction workers, and roofers and waterproofers. Later, the Secretary removed the roofers and waterproofers craft from the list of discriminatory craft unions.

The June 27, 1969 Order provided that the Area Coordinator of the Office of Federal Contract Compliance, in conjunction with the federal contracting and administering agencies in the Philadelphia area, would determine definite standards for specific goals in a contractor's affirmative action programs. After such standards were determined, each bidder would be required to commit itself to specific goals for minority manpower utilization. The order set forth factors to be considered in determin-

ing definite standards, including: (1) the current extent of minority group participation in the trade; (2) the availability of minority group persons for employment in such trade; (3) the need for training programs in the area and/or the need to assure demand for those in or from existing training programs; (4) the impact of the program upon the existing labor force.

In August, 1969, the Department of Labor held public hearings in Philadelphia pursuant to the Secretary's Order of June 29, 1969. On September 23, 1969, Assistant Labor Secretary Arthur Fletcher made findings regarding the factors heretofore noted and ordered that certain percentage ranges be established as the standards for minority manpower utilization for each of the designated trades in the Philadelphia area for the years 1970, 1971, 1972 and 1973. The Secretary's Order of September 23, 1969 further specified that on each invitation to bid for a federally funded construction project, each bidder would be required to further submit an affirmative action program. Specifically, the Order provided that

> No bidder will be awarded a contract unless his affirmative action program contains goals falling within the range set forth ... above.

> \*    \*    \*    \*    \*    \*

> The purpose of the contractor's specific goals as to minority manpower utilization is to meet his affirmative action obligation under the equal opportunity clause of the contract. This commitment is not intended and shall not be used to discriminate against any qualified applicant or employee. Whenever it comes to the bidder's attention that the goals are being used in a discriminatory manner, he must report it to the Area Coordinator of the Office of Federal Contract Compliance of the U.S. Department of Labor in order that appropriate sanction proceedings may be instituted.

> \*    \*    \*    \*    \*    \*

> The bidder agrees to keep such records and file such reports relating to the pro-

visions of this Order as shall be required by the contracting or administering agency.

The Orders of June 7, 1969 and September 23, 1969 as modified by subsequent executive pronouncements supported by the presidential authority and directive of Executive Order 11246, became known as the "Philadelphia Plan." These orders cumulatively enunciated a policy of non-discrimination in federally financed construction in the area, set minority employment goals for contractors doing federal business in the Philadelphia area, and provided a procedure for encouraging and observing progress toward the attainment of the minority hiring goals set forth in the Plan. The legality of the Philadelphia Plan was upheld in *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.1971) (affirming 311 F.Supp. 1002 (1970)); *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

Both the June 7, 1969 order and the Order of September 23, 1969 provide that in the event a contractor has failed to meet the applicable minority manpower utilization goals, he will be given an opportunity to demonstrate that he has made every good faith effort to meet such goals.

On February 13, 1971, the Philadelphia Plan was amended to include all construction activities by contractors and subcontractors working on federally assisted construction sites. On April 7, 1978, the Department of Labor issued regulations which abolished the Philadelphia Plan as a separate regulation but established uniform equal employment opportunity requirements for all federal construction contractors (*see* 43 Fed.Reg. 14,888 (1978); 41 C.F.R. Part 60–4). These regulations, which became effective May 8, 1978, govern all contractors and subcontractors who have a federal or federally-assisted contract in excess of $10,000. On March 20, 1979, the Labor Department published goals for minority utilization in the operating engineers

trade within the jurisdiction of Operating Engineers Local 542. The Department issued these goals on the basis of the findings of fact in *Commonwealth of Pennsylvania v. Local Union 542 of the Operating Engineers,* 469 F.Supp. 329 (E.D.Pa.1978), *aff'd,* 648 F.2d 923 (1981), *rev'd and remanded,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The minority employment goal for metropolitan Philadelphia was 17.3%. On September 7, 1979, the Department of Labor issued a nation-wide proposed formula for determining the minority utilization goals to be established for each metropolitan area regarding crafts and trades for each contractor working on federal or federally-assisted construction contracts or subcontracts in excess of $10,000 (*see* 44 Fed.Reg. 52,348). The proposed formula was implemented on November 3, 1980.

On October 8, 1978, Executive Order 12086 (43 Fed.Reg. 46501) transferred all compliance and enforcement responsibility under E.O. 11246 to the Secretary of Labor. The Secretary has delegated these duties to the Office of Federal Contract Compliance Programs (OFCCP) of the Labor Department. As heretofore noted, E.O. 11246 originally provided that the agency for whom the federal project was being constructed or for whom the contractor did the bulk of his business would act as the compliance and review agency responsible for supervising compliance with E.O. 11246.

This litigation commenced in 1975 when plaintiffs filed their complaint, which alleged that the defendants (the U.S. Department of Labor, the Secretary of Labor, the OFCCP, the OFCCP Director, the Labor Department's Bureau of Apprenticeship and Training (BAT) and the BAT Associate Administrator) had failed to enforce the obligations of contractors and subcontractors working on federal or federally-assisted construction projects in the Philadelphia area. Specifically, plaintiffs alleged that defendants had not required the contractors to comply with E.O. 11246 and the Philadel-

phia Plan, which required that the contractors make good faith efforts to employ minority workers in the skilled trades utilized in federal construction projects. Plaintiffs also charged that the defendants BAT and the BAT Associate Administrator had failed to enforce the National Apprenticeship Act of 1937, 29 U.S.C. § 50 et seq. by failing to properly implement the non-discrimination and affirmative action obligations of the Pennsylvania Apprenticeship and Training Council and sponsors conducting apprenticeship programs registered with BAT pursuant to federal regulations requiring that those engaged in BAT-supervised programs comply with certain non-discrimination provisions (*see* 30 C.F.R. § 30.1, *et seq.*).

During pretrial proceedings, several motions were filed by the parties. Because the parties repeatedly assured the Court that settlement was imminent, the Court delayed ruling on the motions until July 31, 1980 when it became apparent that settlement could not be achieved. In its Order of July 31, 1980, the Court certified this case as a class action (*see* p. 730, *supra*). As heretofore noted, trial was held before the Court sitting as a trier of fact. Based on the evidence presented at trial, the Court finds the following facts.

II.  *Findings of Fact*

A.  *Discrimination in Philadelphia-area Building Trades Today*

The named individual plaintiffs in this action, Ronald Taylor, David King, Nathaniel Brown, are black men who sought to work in the skilled building trades but were unable to consistently find such work due to the discriminatory practices of their respective union hiring halls. For all three, efforts to obtain satisfactory trades work have proven so futile that they have either left the Philadelphia area or their chosen trade.

Taylor, an ironworker, has returned to school to study accounting. At trial, he

testified that he wished to work as an ironworker but that he could not find sufficient work in the Philadelphia area under the current arrangement between the contractors and the unions. David King, also an ironworker, moved to Winston-Salem, North Carolina. There, he has been able to obtain work in his trade with non-union affiliated contractors but, as a non-union ironworker in the South, has not received the same level of pay and benefits that he would have received working an equivalent amount of time through Local 405 of the Ironworkers in Philadelphia. Nathaniel Brown moved to Phoenix, Arizona. There, he has been able to work as a plumber for non-union contractors, though he was unable to progress through the apprenticeship program and find sufficient plumbers' work in Philadelphia when he sought employment through the hiring hall procedure of Plumbers Local 690.

The Assistant Secretary's findings of fact which accompanied the Labor Department's Order of September 23, 1969 noted that discrimination against black workers was a common occurrence in the skilled craft union hiring halls of Philadelphia and that these hiring halls held the key to employment in these fields since nearly all such construction contractors in Philadelphia obtained their workers through the union's hiring halls. Concluded the Labor Department:

> Equal employment opportunity in [the skilled craft] trades in the Philadelphia area is still far from a reality. The unions in these trades still have only about 1.6 percent minority group membership and they continue to engage in practices, including the granting of referral priorities to union members and to persons who have work experience under union contracts, which result in few Negroes being referred for employment.

Order of June 27, 1969, p. 4.

Subsequent events have shown that the inability of many minority workers to ob-

tain jobs results not only from slavish adherence to traditional preference practices but also from overt discrimination on the part of the union. *See, e.g., Commonwealth of Pennsylvania v. Local 542 Int'l Union of Operating Engineers,* 469 F.Supp. 329 (E.D.Pa.1978), *aff'd* 648 F.2d 923 (1981), *rev'd and remanded,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *United States v. Elevator Contractors Local 5,* 398 F.Supp. 1237 (E.D.Pa.1975), *aff'd* 538 F.2d 1012 (3d Cir.1976). The experiences of Messrs. Taylor, King, and Brown illustrate the difficulties faced by black construction workers seeking work through the union hiring halls in Philadelphia.

Taylor participated in the apprenticeship programs of Ironworkers Local 405 in Philadelphia, and became a journeyman ironworker. He lived in Philadelphia and thus sought work in the area. However, when he participated in the local's hiring hall, he could only infrequently get work, usually at the most undesirable jobs and job sites. He was eventually driven to seek work outside the area and found work in Northern New Jersey. Prior to that, he had directly applied for work with contractors at job sites in the Philadelphia area but was turned down because he had not been referred to the job by the ironworkers local, and because this was the only means whereby a contractor would hire an ironworker.

David King's experiences paralleled those of Taylor. King joined Local 405 as an apprentice member in 1969. In 1971, he became a journeyman ironworker. At that time, frustrated by what he perceived as discrimination, he and Taylor and others filed suit against Local 405 pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* In that suit (E.D.Pa. Civil Action No. 76–810), King claimed that Local 405's hiring hall discriminated against black union members by referring for employment white members whose names were lower on the referral priority list than the names of the black

members. King also claimed that white union members received the most desirable Philadelphia area work. King testified that on two occasions, he sought work, knew that work was available, had been specifically requested by the contractor seeking ironworkers, but that in both cases white union members below King on the referral priority list were sent to fill the job opening. Prior to commencing suit, King had filed a complaint with the Equal Employment Opportunity Commission (EEOC). King testified that he was unable to obtain any work through the hiring hall after he brought his discrimination complaint. He believed that he had been retaliated against by the union and subsequently moved to North Carolina where he has been working as an ironworker.

From 1969 to 1972, plaintiff Brown participated in the apprenticeship training program of Plumbers Local 690. During this period, he was able to find employment. Brown was one of only a few black members of the plumbers union at that time. While working on federal construction projects as an apprenticeship member of Local 690, Brown was occasionally transferred on short notice from one federal project to another for short periods of time. This is a process commonly known as "bicycling." Its purpose is to create the appearance of more black workers on the construction sites than the actual number working there whenever the construction contractor was facing an "on-site compliance review" by the federal government and needed to create the impression that he had achieved or was close to achieving the minority employment goals of the Philadelphia Plan.

In September, 1972, Brown was suspended from the Local 690 apprenticeship program without prior notice or opportunity to be heard because of the union's policy against beards or other facial hair. Brown alleged that the policy discriminated against blacks since many more blacks than whites are not able to shave closely without making their skin prone to staph infections. After his suspension, Brown was unsuccessful in securing employment. In March, 1975, he filed a Title VII action against Local 690 (*Brown v. Local 690, Plumbers and Pipefitters Union,* (E.D.Pa. Civil Action No. 75–861)). The suit was subsequently settled. Despite the settlement, Brown perceived that his status as a "troublemaker" would preclude him from progressing through the Local 690 apprenticeship program and obtaining regular work in the area; he subsequently moved to Arizona.

Apparently, the situations described above are not infrequent. Five of the seven trade unions named in the original Philadelphia Plan of September, 1969, which have been subject to the minority utilization goals of the Plan, have been defendants in race discrimination litigation brought pursuant to Title VII. In addition to the cases heretofore cited involving Taylor and King, and Brown, other cases are: *Ray v. Ironworkers Local 401,* (E.D.Pa. Civil Action No. 75–3657), *Commonwealth of Pennsylvania v. Local 542 Operating Engineers,* 469 F.Supp. 329 (E.D.Pa.1978), aff'd 648 F.2d 923 (1981), *rev'd and remanded,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), *United States v. Elevator Contractors Local 5,* 398 F.Supp. 1237 (E.D.Pa. 1975), aff'd 538 F.2d 1012 (3d Cir.1976), and *Young v. Local 19, Sheetmetal Workers,* (E.D.Pa. Civil Action No. 70–2103). As heretofore noted, in *Local 542* and *Local 5* the Court made findings of discrimination on the part of the union and/or the contractors. The *Local 401* and *Local 19* cases have resulted in court-approved settlement and a consent order, respectively.

The evidence in this case shows that there is an ample supply of minority workers who either could work or could be trained to work in the building trades and who would seek and accept such work but for the barriers of discrimination. The Labor Depart-

ment's September 23, 1969 Order found as fact based on the Department's hearings of August 26, 27 and 28, 1969 that:

The nonwhite unemployment rate in the Philadelphia area is approximately twice that for the labor force as a whole and the total number of non-white persons unemployed is approximately 21,000. There is also a substantial number of persons in the nonwhite labor force who are under-employed. Testimony adduced at the hearing indicates that there are between 1,200 and 1,400 minority craftsmen presently available for employment in the construction trades who have been trained and/or had previous work experience in the trades.

In addition it was revealed at the hearing that there is a pool of 7,500 minority persons in the Laborers Union who are working side by side with journeymen in the performance of their crafts in the construction industry. Many of these persons are working as helpers to the journeymen in the designated trades. Also, testimony at the hearings established that between 5,000 and 8,000 prospective minority craftsmen would be prepared to accept training in the construction crafts within a year's time if they would be assured that jobs were available to them upon completion of such training.

Based upon the number of minority group persons employed in the designated trades for all industries (construction and non-construction) and those minority group persons who are unemployed but qualified for employment in the designated trades, a survey by the Manpower Administration [of the Labor Department] indicated that minority group persons are now in the area labor market as follows:

| Identification of Trades | Number Available |
| --- | --- |
| Ironworkers | 302 |
| Plumbers, Pipefitters and Steamfitters | 797 |
| Sheetmetal workers | 250 |
| Electrical workers | 745 |

A survey by the Office of Federal Contract Compliance indicated that the following number of minority persons are working in the designated trades and those who will be trained by 1970 by major Philadelphia recruitment and training agencies and those working in related occupations in non-construction industries who would be qualified for employment in the designated trades with some orientation or minimal training:

| Identification of Trades | Number Available |
| --- | --- |
| Ironworkers | 75 |
| Plumbers, pipefitters | 500 |
| Steamfitters | 300 |
| Sheetmetal workers | 375 |
| Electrical workers | 525 |
| Elevator constructors | 43 |

Based upon this information it is found that a substantial number of minority persons are presently available for productive employment.

Order of September 23, 1969 (Pl. Ex. 4).

Testimony at the public hearing revealed that there is a need for training programs for willing minority group persons at various levels of skill. Such training must necessarily range from pre-apprenticeship training programs through programs providing incidental training for skilled craftsmen who are near the brink of full journeyman status. As discussed above, between 5,000 and 8,000 minority group persons are in a position to be recruited for such training within a year's time.

Testimony at the public hearings revealed the existence of several training programs which have operated successfully to train a number of craftsmen many of whom are now prepared to enter the trades in the construction industry. In order to further assure the availability of necessary training programs, the Manpower Administration of this Department has committed substantial funds for the

development of additional apprenticeship outreach programs and journeyman training programs in the Philadelphia area. It plans to double the present apprenticeship outreach program with the Negro Union Leadership Council in Philadelphia. Presently, this program is funded for $78,000 to train seventy persons. An additional $80,000 is being set aside to expand this program. In addition, immediate exploration of the feasibility of a journeyman-training program for approximately 180 trainees will be undertaken. Both these programs will be directed specifically to the designated trades.

Order of September 23, 1969.

The record in this and other cases is clear. Many of the job placement procedures of the Philadelphia area building trades have been discriminatory in either intent or effect or both. That was the situation in 1969 when the Philadelphia Plan was issued and it was such discrimination that Judge Higginbotham's Order in *Local 542* was designed to remedy. Unchanged, however, is the area contractors' dependence on the union hiring hall procedure for obtaining workers at the job sites, both federal and non-federal. Pursuant to collective bargaining agreements between the contractors and the unions, the contractors rely on the unions to screen job applicants, certify that the worker is qualified in the skilled trade, and issue temporary work permits. The agreements provide that the contractor will hire skilled workers only from the respective union hiring hall unless the contractor requests workers and the hall does not respond to that request within 48 hours. Thus, if the unions discriminate, as they have been found to in the past, and the contractors take only union-sent workers, the net effect is to discriminate against minority workers in all but a few non-union construction projects in the Philadelphia area.

As heretofore noted, the Philadelphia Plan provided ranges of goals for minority workforce composition ranging from 4 and 9 percent (through 1970) to between 19 and 26 percent (through 1973). (*See* Pl. Ex. 4). Effective November 3, 1980, the minority worker utilization goals were set at 17.3 percent for all crafts in the Philadelphia construction area, which was redefined to include the New Jersey counties of Camden, Burlington, and Gloucester as well as the five counties of Southeastern Pennsylvania (Philadelphia, Bucks, Chester, Delaware, and Montgomery). *See* 45 Fed.Reg. No. 194, p. 65848 (Oct. 3, 1980). This change slightly lowered the minority utilization goals of the Plan. Regardless, the parties to this case agree that minority utilization in the skilled building trades on federal construction contracts in the Philadelphia area falls short of 17 percent.

Thus, in 13 years, equal opportunity in the building trades in Philadelphia has remained an unfulfilled goal. However, the question before this Court is not the legality of the conduct of the unions and the contractors, it is the conduct of the government. The unions have been found to have discriminated. The contractors have been found to have acceded to that discrimination through passively following the hiring hall procedures via the collective bargaining agreements. However, the Supreme Court held in *General Building Contractors Association, Inc. v. Pennsylvania*, —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), that this conduct does not justify the imposition of liability pursuant to 42 U.S.C. § 1981 against the contractors, since the contractors' actions themselves are not discriminatory in intent. Regardless, the question now before this Court is whether the defendants, federal government agencies and officials, owed the plaintiff class a non-discretionary duty pursuant to E.O. 11246, the Philadelphia Plan, and the Code of Federal Regulations, and whether these defendants have breached the duty in such a manner that this Court should invoke the writ of mandamus to confer some form of injunctive relief. Consequently, the key issue facing this Court is the performance of the

defendants, not the admittedly poor track record of the unions and the contractors. It is to the government's activities that the Court now turns.

### B. *The Labor Department's Supervision of the Philadelphia Plan*

The evidence presented at trial shows that the Department of Labor has accomplished little by way of implementing the Philadelphia Plan. In certain areas of administration, the Department's performance invites criticism.

For example, at trial, more than 10 years after the formulation of the Plan, the Labor Department's Office of Federal Contract Compliance Programs still had not assembled data which would reveal whether Philadelphia-area contractors doing federal business have increased their utilization of minority workers. This basic data which one would expect to be collected in order to evaluate the plan has not been formulated even though all of the contractors and subcontractors under the Plan are, according to the terms of the Plan, required to submit minority utilization reports to the OFCCP which would show the number and percentage of work hours worked by minority workers. During the period 1975–80, the OFCCP has not attempted to conduct any type of survey to determine the availability of minority workers in the Philadelphia area. The Assistant Regional Administrator of the OFCCP (of the Labor Department) testified at trial that he does not even possess an opinion as to whether minority utilization by federal contractors has increased.

The testimony of Dr. John Flueck, professor of statistics at Temple University, shows that the Plan has not accomplished its goals of increased minority hiring and that in fact use of minority workers by federal contractors declined in the area since the mid-1970s. Dr. Flueck based this conclusion on a review of data contained in OFCCP or other Labor Department records.

The one exception to this overall decline in minority worker utilization in the trades listed above is the Operating Engineers craft, where actual minority utilization was above the Philadelphia Plan goal of 17.3% minority utilization at the time of trial. At that juncture, Local 542 of the International Union of Operating Engineers was subject to a court order which directed federal contractors to engage in remedial hiring of minorities. *See Commonwealth of Pennsylvania v. Local 542, IUEO,* 469 F.Supp. 329 (E.D.Pa.1978), *aff'd* 648 F.2d 923 (3d Cir. 1981). The injunctive relief directed at the union by the district court and affirmed by the Third Circuit remains intact, though the Supreme Court has reversed the decision as to the building contractors. *See General Building Contractors Association, Inc. v. Commonwealth of Pennsylvania,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

In order to fully assess the Labor Department's performance in administering the Philadelphia Plan, this Court must examine the defendants' actions from the inception of the Philadelphia Plan through the date of trial. Of particular relevance is the defendants' performance from October 18, 1978, the effective date wherein Executive Order 12086 consolidated the government contract compliance functions in the Labor Department's Office of Federal Contract Compliance Programs (OFCCP). *See* 43 Fed.Reg. 46501. A major factual defense raised by the Labor Department was the contention that the Department performance administering the Philadelphia Plan could not be fairly judged until the reorganization had taken place because the pre-1978 administration of the Plan posed logistical problems making administration of the Plan extremely difficult.

In assessing the available data, this Court has found the most significant statistic to be the percentage of minority hours worked on federal construction projects in the Philadelphia area. The Court finds this figure more meaningful than the number or percentage of minority workers hired or used

in connection with federal contracts. As the evidence in this case shows, some contractors have been able to achieve the goals of the Philadelphia Plan by hiring the requisite number of minority tradesmen but giving them only a small fraction of the total work in connection with the project, thus circumventing the spirit and thrust of the Philadelphia Plan.

With this in mind, the Court finds that during the period 1971 to October, 1978, the period during which the Philadelphia Plan was in effect but before the consolidation of Plan administration in the Department of Labor, the percent of minority utilization by hour ranged from 9% to 11% depending on the craft. This figure is based upon the monthly Post Contract Implementation Reports (PCIRs) compiled by the Labor Department during 1971 and 1972 (see N.T. 1.129; Pl. Exs. 48c to 54c). In 1972, the minority utilization was again between 9% and 11%. (See N.T. 1.130, Pl. Ex. 48c to 54c). The 1972 figures are based on 7 months of post-contract award compliance reports. (See Pl. Ex. 56). The linear plots of the minority utilization percentages show an increase in minority utilization early in the year and declining minority utilization in the later months of both years (see Pl.Ex. 56). For all but two of the seven trades (sheetmetal and electrical workers), the graphic plotting data showing this relationship is statistically significant at the .05 level. This means that there is only a five percent chance that the observed relationship seen on the graph results from random chance rather than the actual existence of this relationship (see N.T. 1.145–1.150).

The failure to realize the goals of the Philadelphia Plan has affected the area's minority workers in more than an intangible way. By examining the actual minority hours worked and comparing this to the number of minority hours that would have been worked had minority utilization equalled the Plan's goals, one can roughly calculate the number of "shortfall hours,"

that is, the number of hours that minorities would have worked had the Plan's goals been met but that were instead worked by non-minorities because of the failure to meet the plan's goals. During the period from 1971 to October, 1978 (the pre-reorganization period), the number of shortfall hours per month was approximately 9,000 (see Pl.Ex. 48–54, N.T. 1.154). After the reorganization, during the period from October, 1978 until May, 1980, the number of shortfall hours per month increased to approximately 12,000 per month. Even estimating conservatively that there have been 9,000 shortfall hours per month since the Plan's inception, there would be approximately 900,000 total shortfall hours since the institution of the Philadelphia Plan. Had the Plan's goals been met, minority workers in the area would have realized nearly an additional million hours of well-paying trades work, creating hundreds of jobs for minority workers and a better life for them and their families.

As heretofore noted, during the period 1971–78, various federal agencies had compliance responsibilities pursuant to the Philadelphia Plan and these agencies were generally supervised by the Labor Department. After October, 1978, responsibility for administering the Philadelphia Plan, by then codified as part of the Code of Federal Regulations (see generally 41 C.F.R. § 60.1 et seq.) and applicable to all federal construction projects (not just those in the Philadelphia area) was consolidated in the Labor Department's OFCCP. Between October, 1978 and May, 1980, however, the statistical data concerning minority utilization in the Philadelphia area fails to reflect any improvements correlated with the consolidation of Plan administration. In fact, the proportion of minority utilization hours declined during this time period as compared to the 1971–1978 period. Even where the Department entered into conciliation agreements with 24 area contractors due to perceived deficiencies in the minority hiring of these contractors, the minority utilization

rate of these particular contractors continued to fall short of the goals set forth in the Plan (see N.T. 1.159–1.168 and Pl.Ex. 72).

Many contractors failed to submit minority utilization reports. Evidence presented at trial suggests that the non-reporting contractors may have been the contractors with the worst minority utilization records but that these businesses sought to mask their minority utilization shortcomings by failing to file the required post contract implementation reports. Thus, the available data may actually overstate the rate of minority utilization in the area. Thus, the real rate of minority utilization may fall even farther below the goals set forth in the Philadelphia Plan.

Evidence presented at trial shows that the Department has generally failed to institute a comprehensive program designed to follow-up and investigate the absence of timely filed compliance reports by the contractors, who are required by Plan regulations to file such reports. In fact, the evidence shows that the Department has followed up on absent reports in only a small percentage of the cases, despite the regulations' requirement that contractors file minority utilization reports.

Furthermore, evidence presented at trial showed that many contractors delinquent in filing compliance reports (Post Contract Implementation Reports (PCIRs) and/or Form 257 Reports, in the jargon of the Department) have been permitted to continue to bid on federal or federally-financed projects in the Philadelphia area and that they have been low bidders on several contracts and are therefore likely to obtain future federal contract work (see Pl.Ex. 73).

Undoubtedly, many factors affect the rate of minority utilization in Philadelphia area federal construction projects. However, the evidence presented at trial permits this Court to conclude that the degree of government enforcement activity signifi-cantly affects the contractors' rate of minority utilization (see generally, N.T. Vol. 11, Testimony of Bennett O. Stalvey, Jr., OFCCP Miami office director). It appears from the evidence that enforcement activity in the Philadelphia area was stronger during the period 1971–75 when minority utilization rates were better and that weaker enforcement activity during the 1977 to 1980 period helped to produce a lower rate of minority worker utilization.

The Labor Department is armed with a wide array of enforcement mechanisms to deal with contractors that fail to cooperate in attempting to achieve the goals of the Philadelphia Plan. Pursuant to Executive Order 11246, there are four primary sanctions which may be applied to government contractors who fail to comply with the Executive Order or regulations (such as the Philadelphia Plan) issued to aid in implementing the order. The Labor Department may (1) cancel a contract; (2) terminate a contract at any stage of the project; (3) suspend a contract or the making of payments pursuant to a contract; and/or (4) debar a contractor from future government contract work. (See Pl.Ex. 1, E.O. 11246, §§ 209–212). To impose these sanctions, the Labor Department must first, pursuant to its own regulations, issue a notice to the contractor requiring the contractor to show cause why any of the heretofore described sanctions should not be imposed. (See 41 C.F.R. Part 60–63; 41 C.F.R. §§ 60–1.26, 1.28, 4.8.

The contractor's non-compliance need not be severe before the Department may initiate an enforcement proceeding. For example, 41 C.F.R. § 60–1.7(a)(4) permits commencement of enforcement measures against contractors for "[F]ailure to file timely, complete and accurate reports as required..." As heretofore noted, contractors subject to the Philadelphia Plan are required to file monthly reports showing the utilization of minorities and women in each of the six building trades. Furthermore, as also noted, many of the contractors

have not complied with this requirement. Despite the high incidence of non-compliance, the Department has not initiated a concerted program to achieve compliance with its own regulation.

The regulations also permit the Department to seek conciliation agreements with contractors who have failed to achieve or maintain minority utilization goals and are in violation of E.O. 11246. As part of any such conciliation agreement, the OFCCP may require that the conciliation agreement commit the contractor to make-up goals and timetables designed to remedy the contractor's past failure to comply with the Executive Order (see 41 C.F.R. § 60–4.8). The process of seeking a conciliation agreement begins when the Department issues a show cause notice to a contractor. After receiving the notice, the contractor has the option of either responding and making a showing that he has committed no violation of the Philadelphia Plan or the Executive Order, or entering into a conciliation agreement with the OFCCP. The OFCCP has broad discretion in drafting and entering into a conciliation agreement. In addition to requiring make-up minority utilization goals, conciliation agreements may contain other corrective measures such as back pay and seniority adjustment for minority workers hired after the conciliation agreement goes into effect. The conciliation agreement procedure and remedies are designed to encourage increased contractor efforts to meet the goals of the Plan without the prerequisite of lengthy enforcement proceedings and a finding of wrongdoing on the part of a contractor. Despite the advantages provided by this enforcement tool, the Department has made negligible use of the conciliation agreement technique.

The Court finds on the basis of the downward trend of minority utilization in the construction trades in connection with federally assisted contracts, the enforcement mechanisms of the Department of Labor have not been utilized to their fullest extent. Between 1970 and 1974, for example, the Department debarred several contractors for noncompliance with the Plan. No debarments have been effectuated since January 20, 1974 (see N.T. 11.69–11.73). During the first half of the decade, the Department more frequently suspended contract payments and withheld contracts as part of their administration of the Plan. During the 1970–75 period, the OFCCP also made affirmative efforts to contact minority community organizations as an aid in compiling and making available to contractors lists of qualified minorities who have worked in the six skilled trades encompassed by the Plan (N.T. 11.57–58). During this period, minority utilization approached and occasionally exceeded the goals set forth in the Plan.

In fact, since the E.O. 11246 enforcement responsibilities were consolidated in the Department of Labor by E.O. 12086 (43 Fed. Reg. 46501; effective date October 8, 1978), no debarment proceedings have been commenced or consummated (see Pl.Ex. 71; N.T. 13.128). From October 8, 1978 until the time of trial, no Philadelphia area construction contractor had been subjected to contract termination, cancellation or suspension. Furthermore, no conciliation agreement entered into since that time has made provision for make-up goals of minority hiring.

Only a few conciliation agreements have been entered into in any form. As of May, 1980, only 24 such agreements had been reached between the Labor Department and area contractors charged with insufficient justification for under-utilization of minority workers. Subsequent to these agreements, more than half the affected contractors reported no change in minority utilization or reported minority utilization which fell below the minimum goals set forth in the Plan. (Pl.Ex. 72).

As heretofore noted, the Labor Department's actions in connection with the enforcement of the Philadelphia Plan have

been minimal. For example, since October 8, 1978, contractors have been awarded new federal contracts during months in which they were not in compliance with minority utilization goals concerning their existing contracts, or when they were not filing timely reports as to their minority utilization. (*See* Pl.Exs. 73 and 74). For more than one year after October 8, 1978, due to Department re-organization efforts, OFCCP employees were in fact instructed not to issue show cause notices to contractors who had failed to submit timely minority utilization reports (*see* N.T. 12.25–12.39; 8.13).

Between October 8, 1978 and June, 1979, no show cause notices were issued to Philadelphia area construction contractors. Between June, 1979 and June, 1980, only one such notice was issued despite the fact that the Philadelphia area OFCCP office had issued five recommendations for such notices (*see* N.T. 12.51; 13.95; 13.109; 8.18; Pl.Ex. 167); Defendant's response to plaintiff's request for admission No. 43 (First Set).

Beyond doubt, the plaintiffs demonstrated at trial that the Department's administration of the Philadelphia Plan was far from perfect and that certain enforcement mechanisms were not being utilized as fully as one might expect. Furthermore, the evidence shows that minority utilization in the area building trades has tended to level out short of the goals of the Philadelphia Plan and may have declined during the late 1970s. However, this is an action seeking a writ of mandamus pursuant to 28 U.S.C. § 1361. Mandamus is an extraordinary remedy that may only be ordered where the defendants have failed to perform a clear duty owed to the plaintiffs. (*See* Section III, pp. 743–748, *infra*). Thus, the question before this Court is not whether the defendants have administered the Philadelphia Plan in a commendable manner or in the manner preferred by the plaintiffs or this Court. Clearly, the defendants have failed to accomplish any one of these objectives. However, the real issue as to mandamus in this litigation is whether the Labor Department has done nothing or has done so little as to amount to nothing in its administration of the Philadelphia Plan. It is clear to this Court that the plaintiffs have failed to prove by a preponderance of the evidence that the defendants have done nothing or so little as to amount to nothing in their enforcement of the Philadelphia Plan. The Labor Department's performance, while leaving much to be desired, is sufficient to preclude a mandamus order of this Court.

Since the reorganization of the Labor Department and the abolition of the Philadelphia Plan as a separate regulation (*see* 43 Fed.Reg. 14894), the Department's OFCCP has chosen to place supervisory emphasis on different segments of the Plan's regulations than those stressed by plaintiffs, particularly on 16 good faith steps which contractors must show in order to participate in federally aided projects (*see* 41 C.F.R. § 60–4.3).

While the Department has not done a good job of monitoring the contractors' duty to file regular minority utilization reports, the Labor Department's failings in this regard are not so deficient as to constitute the violation of a clear duty owed to the plaintiffs. Furthermore, many of the Labor Department's present shortcomings in this area result from previous inefficiencies in the division of compliance responsibilities among several different agencies and the subsequent revision of the Philadelphia Plan to vest compliance responsibilities within the OFCCP. (*See* N.T. 10.20–10.40; 10.136–137; 12.13–12.20; 12.127–12.131; 12.76; 14.35). Though the Labor Department might better have coped with these logistical difficulties, the evidence presented at trial shows that it did attempt to effectively administer the Plan. (*See* N.T. 4.35–4.40; 12.25–12.55; 14.10–14.32; Def. Exs. 61, 63; 13.40–13.68; Def.Exs. 36, 37).

After the abolition of the Philadelphia Plan as a separate regulation, the Labor Department in 1980 applied E.O. 11246 on a nationwide basis by establishing uniform regulations for the entire federally-assisted construction industry throughout the nation. The goals of the Philadelphia Plan

were considerably higher than the minority utilization goal of 17.3 percent which became effective on November 3, 1980. The salutary desire of the Labor Department in establishing minority utilization goals of 17.3% for all trades in the area based upon a national goal calculation formula could well have been accomplished without reducing the minority utilization goals which had been in effect for the Philadelphia metropolitan area under the Philadelphia Plan. The substitution of the 17.3% figure for the trades-specific goals set forth in the Philadelphia Plan resembles a discretionary act and does not violate any clear duty owed to the plaintiffs and does not support the issuance of a writ of mandamus.

The performance of the Labor Department's Bureau of Apprenticeship and Training (BAT), like that of the OFCCP and the other defendants, has been imperfect but has not violated a clear duty owed to the plaintiffs. Pursuant to the National Apprenticeship Act, 29 U.S.C. § 50 et seq., BAT is charged with implementing the duties and policies vested in the Secretary of Labor (see 29 C.F.R. Part 30, § 30.1–30.-19). The regulations provide that BAT policy is to promote equal employment opportunity, non-discrimination and affirmative action in apprenticeship programs registered with the Labor Department. Apprenticeship programs that discriminate or fail to provide equal opportunity may be deregistered by BAT.

In the Philadelphia area, BAT operates as part of the Labor Department's regional office. In the five-county area of Southeastern Pennsylvania, most apprenticeship programs for the building and construction trades are operated by labor organizations. In order to attain union tradesman status, workers must normally have completed a union-run apprenticeship program. Apprenticeship programs in Pennsylvania are administered by the Pennsylvania Apprenticeship and Training Council. Pursuant to 29 C.F.R. § 30.9, the Labor Department is responsible for conducting compliance reviews of the registered apprenticeship programs and their sponsors. However, where a state apprenticeship council such as that of Pennsylvania exists, these state councils are delegated certain duties and responsibilities to bring non-complying apprenticeship programs into compliance (see 29 C.F.R. § 30.15(a)(4)) and to adopt a state equal opportunity plan for such programs (29 C.F.R. § 30.15(a)(2)).

As stated by the United States Supreme Court in *United Steelworkers of America v. Weber,* 443 U.S. 193, 199 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979), "Judicial findings of exclusion from crafts on racial grounds are so numerous as to make such exclusion a proper subject for judicial notice" (citing cases). However, no Philadelphia area apprenticeship programs or their sponsors have been deregistered. The evidence presented at trial shows that BAT has chosen to vest primary enforcement responsibility in the Pennsylvania Council (see Deposition of Regional BAT Director Ballentine). This decision as to enforcement schemes lies within BAT's discretion as delimited by the applicable regulations (see 29 C.F.R. § 30.15).

In summary, the evidence presented at trial revealed an unimpressive Labor Department performance in its administration of the Philadelphia Plan. Since 1977, minority utilization in the construction trades in the metropolitan Philadelphia area has declined. The reorganization of enforcement functions, which took effect on October 3, 1978, has signalled little improvement in obtaining compliance. There is no doubt that the Philadelphia Plan has fallen far short of its minority utilization goals. This Court must determine whether the Department's failures are of sufficient magnitude to make mandamus an appropriate remedy.

III. *The Law of Mandamus*

■ Subject matter jurisdiction in this action is conferred pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1361 (mandamus). Section 1361 provides

The district courts [of the United States] shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff. The mandamus statute is a waiver of sovereign immunity and may be invoked against the federal government where a plaintiff has satisfied the prerequisites of mandamus relief (*Huffstutler v. Bergland,* 607 F.2d 1090, 1092 (5th Cir.1979) (per curiam); *Beal v. Blount,* 461 F.2d 1133, 1138 (5th Cir.1972).

To obtain mandamus relief, the plaintiff must establish, by a preponderance of the evidence, three elements: (1) the plaintiff must have a clear right to the relief requested; (2) the defendant must have a clear duty to act, and (3) no other adequate remedy must be available to the plaintiff. *See Sheehan v. Army and Air Force Exchange Service,* 619 F.2d 1132, 1139 (5th Cir.1980); *Accord, Save the Dunes Council v. Alexander,* 584 F.2d 158 (8th Cir.1978); *Billiteri v. United States Board of Parole,* 541 F.2d 938 (2d Cir.1976).

In order for mandamus to issue, a plaintiff must show that an officer or agency of the United States owes him a legal duty which is a specific, plain ministerial act devoid of the exercise of judgment or discretion. An act is ministerial only when its performance is positively commanded and so plainly prescribed as to be free from doubt. *Richardson v. United States,* 465 F.2d 844, 849 (3d Cir.1972); *accord Mattern v. Weinberger,* 519 F.2d 150, 156 (3d Cir. 1975).

In certain instances, mandamus relief has been granted where the performance of an act is not completely a ministerial duty but is in part committed to an official's discretion. Mandamus orders may in rare cases issue "where Federal officials are not acting within the zone of their permissible discretion but are abusing their discretion or otherwise acting contrary to law." *Davis v. Shultz,* 453 F.2d 497, 502 (3d Cir.1971). This limited adjustment to the mandamus requirement that the defendant owe plaintiff a clear ministerial duty does not permit a court to substitute its judgment for that of the government agency or official by characterizing the disapproved government conduct as an abuse of discre-

tion. As the Third Circuit observed in *Pennsylvania v. National Ass'n of Flood Insurers,* 520 F.2d 11 (3d Cir.1975):

[M]andamus may issue to require the exercise of permissible discretion, *see McQueary v. Laird,* 449 F.2d 608, 611 (10th Cir.1971), although the manner in which the discretionary act is to be performed is not to be directed by the court. *See Larson v. Domestic and Foreign Corp.,* 337 U.S. 682, 695, 69 S.Ct. 1457, [1464] 93 L.Ed. 1628 (1949).

520 F.2d at 27. Thus, a court may issue a writ of mandamus affecting government discretionary conduct only where the government agencies or officials have completely failed to act or are acting despite legal prohibitions barring such action. *See J.E. Brenneman Co. v. Schramm,* 473 F.Supp. 1316 (1979). Regarding the nature of an official's duty that is required in order to satisfy the first of the three elements required for mandamus, the Third Circuit has concluded "that where there has been an action taken by a government official contrary to law and so plainly prohibited as to be free from doubt, it may be remedied by the issuance of a writ of mandamus." *Naporano Metal & Iron Co. v. Secretary of Labor,* 529 F.2d 537, 542 (3d Cir.1976). *See also Commonwealth of Pennsylvania v. National Ass'n of Flood Insurers,* 520 F.2d 11, 25–27 (3d Cir.1975).

Because the mandamus remedy is an "extraordinary" one, the federal courts should be reluctant to craft too broad a definition of the terms "ministerial duty" and "abuse of discretion." *See Cartier v. Secretary of State,* 506 F.2d 191 (D.C.Cir. 1974), *cert. denied,* 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101; *City of Highland Park v. Train,* 374 F.Supp. 758 (N.D.Ill.), *aff'd,* 519 F.2d 681 (7th Cir.1974). Thus, an official's duty must be "clear, plainly defined, and peremptory" before mandamus will lie. As the Seventh Circuit noted in *Save the Dunes Council v. Alexander, supra,*

The peremptory duty must be either a ministerial one or an obligation to act within a specified range of discre-

tion.... [M]andamus jurisdiction does not lie to direct the exercise of administrative discretion within its lawful boundaries.

584 F.2d at 162. A court may not issue a writ of mandamus merely because it disagrees with the manner in which the government has exercised its discretion. *Billiteri v. United States Board of Parole,* 541 F.2d 938, 947 (2d Cir.1976); *Leonhard v. Mitchell,* 473 F.2d 709 (2d Cir.), *cert. denied,* 412 U.S. 949, 93 S.Ct. 3011, 37 L.Ed.2d 1002 (1973).

██ The shortcomings of the defendants in this case do not constitute duties "so plain as to be free from doubt." *Naporano Metal & Iron Co. v. Secretary of Labor,* 529 F.2d 537 (3d Cir.1976). Here, the Labor Department has exercised its discretion to place enforcement emphasis on the 16 objective measures of affirmative action steps rather than upon other specific enforcement tools suggested by the plaintiffs. The Department, pursuant to adopting nationwide affirmative action plan for federal contractors and reorganizing and centralizing the administration of this program, has determined that the goal of non-discrimination in federal contract employment can best be achieved through the use of objective, nationally standardized measures, and has decided to give this enforcement scheme a try before shifting to new enforcement tactics, including those advocated by plaintiffs. Though this approach has not yet been shown to be effective in the Philadelphia area (*see* pp. 735–741, *supra*), this Court has not been vested with the authority to second-guess the discretionary conduct of federal executive branch officials but may only invoke mandamus where the defendants have failed to perform a clear duty owed to the plaintiffs. The preponderance of the evidence presented at trial does not support a finding that the defendants have violated a clear duty owed to the plaintiffs. The defendants have chosen a different path than that advocated by the plaintiffs. Although this Court agrees with the plaintiffs that the defendants have been engaged in a long circuitous journey which still leaves unfulfilled the goal of the Philadelphia Plan, even if the wisdom of the Department's choices is seriously suspect, the Department nevertheless retains the authority to make those discretionary choices as to the manner of administering the Philadelphia Plan. It has long been the law that "only in clear cases of illegality of action that courts will intervene to displace the judgments of administrative officers or bodies." *Hammond v. Hull,* 131 F.2d 23, 25 (D.C.Cir.1942).

The plaintiffs note that the Department, pursuant to its rulemaking power under the Plan, has promulgated certain regulations establishing enforcement tools which the Department may employ to deal with contractors who fail to comply with the Philadelphia Plan and its regulations affecting them. Thus, it cannot be said that the defendants have taken no action to seek to implement and administer the Philadelphia Plan.

██ It has, however, been held that mandamus jurisdiction "is properly invoked when it appears that a federal official may not have complied with the procedures promulgated to govern his conduct." *Pacemaker Monitor Corp. v. United States Government,* 440 F.Supp. 473, 480 (S.D.Ga. 1977). In particular, "a violation of a governmental agency's own regulations can be the basis [for mandamus jurisdiction.]" *Andujar v. Weinberger,* 69 F.R.D. 690, 693–94 (S.D.N.Y.1976); *see also Ryan v. Shea,* 525 F.2d 268 (10th Cir.1975); *McMahon v. Califano,* 476 F.Supp. 978, 982 (D.Mass. 1979). In this case, the evidence presented at trial shows that many area contractors have failed to comply with the Plan's regulations and that the Department has not succeeded in compelling the contractors to achieve compliance. In particular, the Department has failed to make follow-up inquiries of each of the federal contractors or sub-contractors who has failed to submit timely minority utilization reports each month. However, this shortcoming does not amount to an agency's "violation" of its own regulations within the meaning of the cases heretofore cited.

In this case, having benefit of the evidence presented at trial, and having reviewed the relevant Executive Orders, the Labor Department regulations, and the Philadelphia Plan as a whole, this Court has determined that the Department regulations cited by the plaintiffs do not impose upon the defendants the type of clear, affirmative, peremptory duty which would entitle the plaintiffs to mandamus relief. The Philadelphia Plan itself sets forth a general policy directed toward achieving equal opportunity in federal construction contracts. The Executive Orders give the Labor Department an array of enforcement tools and discretion to place emphasis upon such enforcement measures as it feels will best effectuate the Plan. The Department is also given broad authority to promulgate internal regulations for administration of the Plan. Nowhere in the background and language of the Executive Orders is it suggested that the regulations affecting contractors drafted by the Department itself as part of the Department's broad discretionary enforcement authority under the Plan were in any way intended to impose an ironclad straight-jacket upon the Department which would permit an injunction directed against the Department merely because it had tried and failed to force the contractors into 100 percent compliance with its regulations. The plaintiffs do not have a right to require the defendants to achieve total satisfaction of this portion of their own internal regulations so long as the defendants are, as a whole, acting within the limits of their discretion to effectuate the goals of the Philadelphia Plan.

The need to accord the defendants at least this much discretion becomes all the more important in light of the limited resources available to government agencies such as the Labor Department. The Department could perhaps achieve 100 percent satisfaction of every internal operating rule, no matter how little contribution the rule made to the overall goal of the Plan, if the Department spent enough money and assigned enough personnel to the task. However, stringent follow-up of contractors who are delinquent in filing minority utilization reports simply has not been shown to be a clear duty owed to the plaintiffs. The Labor Department may believe, for very good reasons, that its resources should be invested in other enforcement techniques. The language and background of the Plan and related Executive Orders suggest that the Department should be given at least this much discretion to allocate funds in accordance with its judgment regarding the best means of reaching the Plan's goals. The Court therefore concludes that the plaintiffs have failed to show that they have a clear right to the relief sought or that the defendants have failed to fulfill a clearly defined duty owed to the plaintiffs.

At trial, plaintiffs contended that the decision *Commonwealth of Pennsylvania v. Local 542, Int'l. Union of Operating Engineers,* 469 F.Supp. 329 (E.D.Pa.1979), aff'd 648 F.2d 923 (1981), empowered this Court to issue a writ of mandamus requiring the Department to impose the heaviest of sanctions against federal contractors who had failed to achieve the minority utilization goals of the Philadelphia Plan. However, on June 29, 1982, the Supreme Court reversed the *Local 542* decision as applied to the non-union defendants and remanded the case. *See General Building Contractors Association, Inc. v. Pennsylvania,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The Court held that the civil rights statutes, in particular 42 U.S.C. § 1981, do not permit sanctions to be imposed against a party unless that party is found to have committed some act of purposeful discrimination. In *Local 542,* only the union defendants were found to have purposefully discriminated. The Supreme Court specifically stated that employers may not be punished for race discrimination upon a theory of respondeat superior for the discriminatory acts of a union.

Were this Court to follow the approach suggested by the plaintiffs, it would be acting at odds with the *General Building Contractors* decision in that any such mandamus order of this Court would by implication not only permit but compel the Labor Department to punish federal contractors

for low minority utilization in spite of the Department's discretionary conclusion as to the proper course of action.

Admittedly, there is a distinction between requiring retroactive hiring and damage payments, as the *Local 542* Order did, and withholding the benefits of federal contracts, as the plaintiffs urge this Court to direct the Labor Department to do. However, it would be an abuse of this Court's discretion to direct that the Labor Department employ measures against all contractors falling short of the Plan's goals, regardless of the fault of those contractors.

Plaintiffs have also contended that the decision *Legal Aid Society of Alameda County v. Brennan (LASAC)*, 608 F.2d 1319 (9th Cir.1979) would support a writ of mandamus from this Court compelling the Labor Department through the OFCCP to fully satisfy each of its regulations whatever the cost even if the Department has determined that enforcement would best be enhanced by differential emphasis on the regulations. For example, plaintiffs seek an order requiring that the OFCCP make an inquiry whenever a contractor is delinquent in filing a timely post contract implementation report and contend that *LASAC* would support such an order.

▓▓ *LASAC,* however, is distinguishable from the present case. In *LASAC,* the plaintiffs charged that the government agency failed to review the affirmative action programs of a majority of federal contractors within its compliance jurisdiction and that where such compliance reviews were undertaken, the officials had regularly approved programs that did not comply with E.O. 11246 and the applicable regulations. In this case, plaintiffs have not established that the Labor Department's shortcomings are so vast. Rather, the instant plaintiffs have established only that the Department's follow-up supervision of federal contractors who have not submitted acceptable affirmative action plans and compliance reports is deficient. Unlike the clear and mandatory regulations at issue in *LASAC,* the follow-up supervision regulations do not impose such a clear duty upon

the defendants as to justify the issuance of a writ of mandamus.

In describing the rules at issue in *LASAC,* the Ninth Circuit noted

There is no discretion as to the presence of these components (goals and timetables) in an acceptable affirmative action plan. Programs that lack them do not comply with [the regulations]. Judicial review is available to insure that compliance officials perform their *nondiscretionary* duty to refrain from approving plans that do not contain the elements mandated by the regulations.

\*  \*  \*  \*  \*  \*

As appellants correctly argue, areas of the administrative process so laced with discretion are traditionally shielded from direct judicial intervention. But these are not the areas to which appellees sought and obtained relief. Appellees' claim went to a threshold matter—the required content of acceptable affirmative action plans. *This issue is distinct from such subsequent questions as to whether a contractor is in compliance with a valid affirmative action program (to which the good faith standard is relevant), or what should be done to secure compliance once it is determined that a contractor has violated his affirmative action obligations* [to which the conciliation provisions are directed]. Appellees seek only to require [compliance] officers ... to perform the ministerial duty of complying with their own regulations by disapproving programs that do not contain the elements required by the regulations.

608 F.2d at 1331 (citations and footnote omitted; emphasis supplied).

▓▓ The Department regulations requiring contractors to file timely implementation reports and making non-complying contractors subject to various sanctions, when viewed as part of the enforcement mechanism of the Plan as a whole, simply do not require the Department to perform ministerial acts as did the regulations at issue in *LASAC.*

However persuasive may be the plaintiff's arguments regarding better ways of administering the Plan, these arguments do not support the issuance of a writ of mandamus against any of the defendants. The Court will therefore enter an Order granting judgment in favor of the defendants. This Memorandum is in lieu of findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## ORDER

AND NOW, this 7th day of December, 1982, trial in this matter having been held before this Court, sitting without a jury on July 28–30, 1980, on February 23–27, 1981, March 3–5, 1981, and May 12–15, 18, 1981, for the reasons set forth in this Court's Memorandum of December 7th, 1982,

IT IS HEREBY ORDERED: JUDGMENT is entered in favor of defendants the United States Department of Labor, the Office of Federal Contract Compliance, the Bureau of Apprenticeship and Training, the United States Department of Housing and Urban Development, the United States Department of Health, Education and Welfare, John Dunlop, Phillip J. Davis, Hugh C. Murphy, Carla Anderson Hills, Wagner Jackson, Caspar W. Weinberger, Dewey Dodds, Russell E. Train, and George Dukes, and against plaintiffs Ronald Taylor, Nathaniel Brown, David King, Claude Bass, Sammy J. Paul, and Resurrection, Inc.